UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM D. MONTAGUE,

        Plaintiff,

vs.                          CIVIL NO.: 04-CV-73791-DT

COMMISSIONER OF         HON. AVERN COHN
SOCIAL SECURITY,         MAG. JUDGE WALLACE CAPEL, JR.

        Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.**      **RECOMMENDATION**

It is recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

**II.**    **REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB] and supplemental security income [SSI]. Plaintiff filed for benefits on September 10, 2001, alleging that he has been disabled and unable to work since November 19, 2000, due to a left leg injury. (TR 51-53, 64, 235-38). The Social Security Administration [SSA] denied benefits initially on December 4, 2001. (TR 25-29, 239-42). A de novo hearing was held on October 2, 2003, before Administrative Law Judge [ALJ] Douglas N. Jones. (TR 250-300). In a decision dated November 13, 2003, the ALJ denied Plaintiff benefits. (TR 16-23). The ALJ found that Plaintiff retains the residual functional capacity [RFC] to perform a significant range of sedentary work. (TR 21, 22). The ALJ further found that Plaintiff

1

is not disabled within the meaning of the Social Security Act. (TR 23). The Appeals Council denied Plaintiff's request to review the decision on August 13, 2004. (TR 5-8). Plaintiff has commenced this action for judicial review.

### A.   PLAINTIFF'S TESTIMONY

Plaintiff testified that he lives in a two story home with a basement, located at 2218 Illinois Avenue in Flint, Michigan. (TR 254). He stated that he has lived there for eight years. Id. He testified that he resides with his wife, who owns her own cleaning company and works for Fitness USA. (TR 254, 264, 273). He explained that after his injury, he went to Fitness USA after ten in the evening with his wife to work out and swim while he was there, per his doctor's orders. (TR 265). He explained that he did "[n]ot [do] very well" when he tried to help her clean there because of his injury. Id.

Plaintiff testified that he was born on November 28, 1962, and finished the tenth grade in high school. (TR 254-55). He stated that he started the eleventh grade, but did not finish, nor did he continue with any additional training. (TR 255). Plaintiff stated that he is five feet, seven inches tall and weighs two hundred and seventy-three pounds. Id. He stated that he is right-handed and currently unemployed. Id. He stated that he last worked on November 18, 2000. Id. When questioned as to why the record reflected he was back to work as a janitor in March 2003, Plaintiff denied returning to work.[1] (TR 255-56).

Plaintiff stated that he last worked for his wife's business in November 2000. (TR 256). He explained that he quit C & D previously, where he built trusses for a little over one year, in the

---

[1]He later explained as referenced above that he attempted to help his wife sometime after his injury with her cleaning business. (TR 265).

earlier part of 2000.  (TR 257, 273-74).  He stated that at C & D he was required to lift a couple hundred pounds with the assistance of another person.  (TR 274).  He explained that he built trusses by hand for homes, but he was not required to cut lumber.  Id.  He stated that he also had a maintenance position with C & D, which required him to lift up to twenty pounds.  (TR 285).  He explained that he was responsible for bringing all the trucks out in the morning, checking the oil, and putting them back in the evening under the maintenance position.  (TR 286).

When asked why his earnings only reflected that he worked for C & D in 2000, he explained that he did not report his income from his wife's cleaning company.  (TR 257).  He stated that he was paid by the job from her in the amount of two hundred to four hundred dollars a week.  (TR 257-58).  Plaintiff stated that he did not apply for unemployment compensation when he stopped working and did not receive any private insurance benefits.  (TR 258).  Plaintiff indicated that he was receiving State Medical assistance and food stamps from Family Independence Agency [FIA], and although he still received the medical assistance, he no longer receives food stamps.  (TR 258-59).  He explained that he only received food stamps for about eight months, and that they stopped sometime in 2001.  (TR 259).

In 1996-1998, Plaintiff reported that he was working a cash job driving a truck and delivering produce.  (TR 261, 275).  He stated that he was responsible for loading, unloading, and delivering the produce.  (TR 261).  He stated that the heaviest he lifted was a one hundred pound bag of potatoes.  (TR 262).  He stated that although it varied, he usually lifted fifty to one hundred pounds on a regular basis.  Id.  He stated that he had a chauffeur's license when he drove truck, but he never had a CDL, and his chauffeur's license has lapsed.  (TR 290).

Plaintiff then testified that he worked for Joann Clutts at JC Catering, doing lunches and dinners at the correctional center in Flint.  (TR 262).  He stated that he was responsible for cooking and delivering there.  Id.  He explained that he did basic cooking, such as hamburgers, soups, and sandwiches.  (TR 263).  He stated that he was not responsible for receiving payment from the correctional facility, but merely had to get the paperwork signed and bring it back.  Id.  Plaintiff also testified that he worked at Golden Dragon Enterprises "delivering produce and stuff."  (TR 263-64).  He also indicated that when he was not catering, he would work in the Dog House Lounge, another business owned by Joann Clutts.  (TR 276).

He indicated that he did service for American Appliance and TV Exchange in 1991.  (TR 260-61, 287).  He stated that he did not have any formal training for same, but it was "just something [he] picked up."  (TR 261, 263, 287-88).  He testified that he lifted "[w]ashers, dryers, refrigerators, stoves, up and down stairs."  (TR 275).  He stated that he probably lifted between one hundred and fifty to two hundred pounds.  Id.  He explained that he installed appliances in customers' homes and sometimes had to read "little" diagrams or schematics.  (TR 287).  He stated that he used hand tools, but no electrical testing equipment.  Id.  He stated that he was supervised by a technician.  (TR 288).

 The ALJ questioned Plaintiff regarding his previous employment.  (TR 260-64).  Plaintiff indicated that he does not remember why he had no income in 1990.  (TR 260).  Later, he stated that he was a vacuum sales person at one point, but did not remember how long he did same or his pay for same.  (TR 275-76).  He indicated that it was a door-to-door sales position.  (TR 275).

From 1987 to 1989, Plaintiff stated that he worked as a pizza cook, while employed with JC Catering.  (TR 288).  He testified that from 1986-1987 he worked for MJ Manufacturing as a machine operator.  (TR 286).  He stated that he was responsible for operating a metal stamping press

4

for the manufacture of satellite dishes, which required him to work with large pieces of metal.  Id. He stated that he had to lift the metal, which weighed less than ten pounds.  (TR 287).

Plaintiff testified that he has a valid driver's license and drives ten or twelve times weekly. (TR 259).  He stated that his license expires in 2005.  Id.  He stated that he usually drives to his children's house or to the store.  Id.  He explained that he has adult stepchildren that live in the area. Id.  Plaintiff indicated that he has not been on any vacations or trips away from the Flint area since November 2000, but he has gone to Detroit.  (TR 260).

Plaintiff testified that he injured his left leg almost three years prior to the hearing.  (TR 265-66).  He stated that he was hospitalized twice for same when it first occurred, which included two surgeries.  (TR 266).  He stated that after his surgery in January he had a brief period of improvement, lasting about two weeks where he could put weight on his leg.  (TR 266, 277).  He stated that the stitches and everything healed, and he had shots in his knee for pain and therapy.  (TR 266-67).  Plaintiff testified that Dr. Walters, his bone specialist and second surgeon, recommended that he bike, swim, and do leg bends, which he would go to Fitness USA to do while his wife cleaned.  (TR 267, 276).

He indicated that Brain Chamberlain was his first surgeon, when the accident initially occurred.  (TR 276).  He stated that he "popped [his] knee and shattered [his] tibia and fibula."  (TR 278).  He stated that he still had problems after the first surgery, including pain.  (TR 277).  He testified that he took Vicodin and Lipitor after the first surgery and continued taking it until just before the hearing date as prescribed.  (TR 282).   He stated that he did not recall that he was also taking Vicodin before his surgery for back pain, although he remembered taking something for his back.  (TR 283).  He testified that Dr. Chamberlain told him to use a cane and he stopped using it

5

too soon.  (TR 281).  He presently no longer uses a cane, per his testimony.  Id.  He stated that he also had an infection, but Dr. Chamberlain was able to take care of it.  (TR 278, 281-82).

However, his kneecap still was not functioning properly and due to problems with insurance and payment, he ended up seeing Dr. Walters for his second surgery.  (TR 277).  Dr. Walters took out some of the bone underneath the kneecap as well as some tissue.  (TR 279).  However, Plaintiff stated that Dr. Walters said he needs a knee replacement, but he is too young for same.  Id.

Plaintiff indicated that he still experiences weakness, pain, and swelling in his left leg.  (TR 267).  He stated that he cannot stand on his leg more than an hour at the maximum and is "having a lot of trouble."  (TR 267-68).  He stated that he can walk one city block and then he experiences the swelling, pain, and weakness.  (TR 268).  Plaintiff described the pain, and stated that it is "all through [his] knee [and] . . . like all the muscles . . . are just ripping."  Id.  He stated that he is unable to ignore the pain and has to elevate his leg to get the swelling to decrease.  Id.

He explained that he will "lay on the floor and put [his] leg up over the chair or something like that, just to kind of keep the blood pressure down . . . over the level of [his] waist."  (TR 269).  He stated that he can sit in a chair without his legs elevated for about two hours, but he has to keep moving to prevent his legs from going to sleep, swelling, and locking up.  Id.  He stated that after sitting that long, he has to stand for a minute before he walks.  Id.  He also stated that he constantly has swelling around his knee.  (TR 269).  He stated that he elevates his leg four or five times a day, throughout the day, every day.  (TR 269-70).  He stated that he elevates it for thirty to ninety minutes at a time, for a total of four to seven hours each day.  (TR 270).  He stated that he cannot go eight hours without having to elevate his leg.  Id.  Plaintiff also testified that he has a lot of

problems with his back and right leg.  Id.  He explained that this is because he overworks his right leg as he tries to "favor [his] left leg with the limp."  Id.

He indicated that Dr. Kokler is his primary care physician.  (TR 277).  Plaintiff testified that he sees Dr. Marsheda for sinus and ear problems.  (TR 271).  He explained that he had a tumor that grew inside his head and that interferes with his inner ears.  Id.  He stated that he has dizziness because his equilibrium is thrown off.  Id.  He stated that in September of 2002 he had sinus surgery for a breathing difficulty, which subsequently improved.  (TR 271-72, 283).  He stated that he also had ear surgery in July of 2003 to remove infection by Dr. Zepian.  (TR 272, 283).  He stated that prior to the ear surgery he had lightheadedness, drainage, "pussing," and loss of hearing, which also subsequently improved.  (TR 273).  He explained that the lightheadedness was interfering with his ability to function prior to the surgery.  Id.  Thus, Plaintiff stated that what limits him from working is his legs and problems arising from a fall in November 2000.  Id.

Plaintiff testified that he has been advised to lose weight and given a diet to follow by his doctors.  (TR 280).  However, he stated that he has not been able to exercise enough to lose the weight.  Id.  He stated that he swims at Fitness USA as well as in his own pool all summer long, but is unable to lose weight.  Id.  He stated that, "I think more the problem is [sic] I like to eat more than I like to work out."  Id.  Plaintiff also testified that he has not quit smoking.  (TR 281).  He stated that he has a half a pack a day habit, but is still trying to cut down.  Id.

B.      **MEDICAL EVIDENCE**

Examinations of the parties' cross-motions for summary judgment reveal that an additional recitation of the Plaintiff's medical evidence would be repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

C.      **VOCATIONAL EXPERT'S TESTIMONY**

Melody Henry, a vocational expert [VE], also testified at the hearing.  (TR 283-97).  She classified Plaintiff's past work as follows:  truss builder,  heavy and unskilled; factory maintenance position, light and unskilled; pizza cook, light and unskilled; cook, delivery, and caterer, light to medium and unskilled; appliance service assistant, very heavy and unskilled; vacuum cleaner sales, light and unskilled;[3] truck driver, medium to heavy and unskilled; and commercial cleaner, light to medium and unskilled.  (TR 290-92).

The ALJ presented a hypothetical question to the VE in which a claimant with Plaintiff's age, education and work experience could perform work with the following restrictions:  "light work that involved lifting or carrying, no, just involved light work.  That involved no use of foot controls on the left leg and only occasionally bending at the knees, occasionally kneeling, occasionally crawling, occasionally climbing stairs, and no climbing of ladders, and no exposure to unprotected heights or uncovered intrinsically hazardous machinery."  (TR 293).  The VE testified that the claimant would not be able to return to any of his past relevant light work because "[t]he sales position is a door to door sales position so you do have some climbing," as well as kneeling, bending, and demonstrating.  Id.  The VE further testified that the factory maintenance position

---

[2]See Subpart E, supra.

[3](TR 92, 103).

would not fit within the hypothetical due to the "up and down" as well as kneeling and crouching down that is necessary for same. (TR 294). The ALJ asked whether there would be other unskilled work that Plaintiff is capable of performing. Id. The VE identified the following light jobs: cashier, 24,100 positions; counter clerk, 2,100 positions; rental clerk, 2,000 positions; and bench assembler, 10,150 positions. Id.

The ALJ asked a second modified hypothetical that assumed inability "to stand for more than 30 minutes without a need to sit down, and couldn't sit for more than 30 minutes without a need to stand, so that they'd have the option to alternate sitting and standing at 30 minute intervals." (TR 294). The VE testified that such a claimant would still be capable of the counter and rental clerk positions as well as a reduced number of cashier positions at 12,000, but the bench assembly would be precluded. (TR 295). The VE stated that there were other positions under the modified hypothetical, such as general office clerk, at a reduced number of 4,535 positions, and record clerk, at 1,070 positions. Id.

The ALJ then asked the VE "to assume the person was limited to sedentary work and had the same limitations, including the option to sit or stand." Id. The VE identified the following occupations: cashier, reduced range of 11,500 positions; receptionist, 4,680 positions; information clerk, 4,000 positions; and visual surveillance monitor, 1,250 positions. (TR 295-96). The ALJ then asked whether the need

> to elevate their knee for a half hour during the eight hour workday and could do that during a lunch period would that - - and by elevate I mean they'd have to put the knee up on something like a hassock or the chairs or sofa or something where it could be slightly above the level of the waist.

(TR 296). The VE stated that this additional limitation would not impact the sedentary or light positions in response to the previous hypothetical. Id. The ALJ asked whether the need to elevate

"the left leg, twice a day for an hour, some of that could be during break time, but the rest of it would  have to be during time that wasn't break time." Id.  The VE testified that "they'd have to be able to accommodate it during the lunch break or the two 15 minute breaks because to get it to that height I don't believe they'd be able to sit at the workstation and work it." (TR 296-97).  The VE clarified that all the positions would be precluded if the leg elevation had to be during the workday.  (TR 297).  However, the VE stated that there was a possibility that with a special accommodation by the employer, the visual surveillance monitoring position may fit within such a limitation. Id.  Plaintiff's counsel declined to question the VE. Id.

**D.    ALJ'S CONCLUSIONS**

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that Plaintiff suffered from "severe"

> impairments best described as:  degenerative joint disease of the left knee status post comminuted fracture of the left proximal tibia of the anterior compartment (November 21, 2000); debridement with closure of fascistomy and open reduction and internal fixation of tibial plateau fracture on November 27, 2000; residual mild valgus deformity, status post arthroscopic medial meniscectomy with synovectomy, chondroplasty and hardware removal in January 2003; low back pain, and exogenous obesity.

(TR 18-19, 21-22).  However, the ALJ determined that he did not have an impairment, either alone or in combination, which meets or equals in severity any listed impairment found in 20 C.F.R. Section 404, Subpart P, Appendix 1, of Regulation No. 4.  (TR 19).  The ALJ found Plaintiff's testimony not fully credible.  (TR 19-20, 22).  He determined that Plaintiff had "the residual functional capacity to perform a significant range of sedentary work."  (TR 21).  Thus, the ALJ concluded that Plaintiff is not disabled.  (TR 23).

E.    **ANALYSIS**

Plaintiff advances two claims in his Motion for Summary Judgment. Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because: (1) the ALJ did not accurately evaluate Plaintiff's impairments in reference to the objective medical evidence, Plaintiff's testimony, or daily activities; and (2) the ALJ improperly assessed Plaintiff's credibility.[4] In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[5] The matter is now ready for decision.

1.    **Standard of Review**

This Court's review of the ALJ's conclusions is limited. The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g) (1997). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted. Black

---

[4]Plaintiff's Motion for Summary Judgment and Brief filed March 29, 2005 (hereinafter "Plaintiff's Brief"), at pages 10-15.

[5]Defendant's Motion for Summary Judgment and Brief filed June 27, 2005 (hereinafter "Defendant's Brief"), at pages 12-18.

v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).   Applying these standards, I will analyze each of Plaintiff's claims.

### a.      ALJ's Conclusions

Plaintiff argues that the ALJ's conclusions regarding his limitations are in error.[6] Specifically, Plaintiff states that the ALJ's conclusions did not properly assess the medical evidence and the Plaintiff's testimony.[7]

### i.      Objective Medical Evidence

Plaintiff alleges that objective medical evidence exists that "document[s] the nature and severity" of Plaintiff's injury and cites to x-ray reports.[8] (TR 111, 113, 124, 127, 140, 141, 142, 143, 211, 216, and 232).   Two of the x-rays were completed on November 19, 2000, the date of injury. (TR 124, 127).   Two other x-ray reports are dated at the time of the first surgery following the injury, November 27, 2000.  (TR 108, 111, 113).   On the date of the first surgery, one x-ray was taken at 10:44 am and the other was at 10:09 pm, which states "the alignment seems to be fairly improved when compared with the pre-op study.  There is a small amount of air noted in the joint [and] a small bone fragment seen in the knee joint on the lateral film.  The possibility of a loose fragment is not totally excluded."  (TR 111, 113).   Plaintiff concedes that he "initially had encouraging post surgical healing" and further, that "he reported little discomfort" in early 2001.[9]

---

[6]Plaintiff's Brief at page 10.

[7]Plaintiff's Brief at pages 10-12.  Plaintiff also alleges that the ALJ's conclusions regarding his daily activities were in error; however, a discussion of same is detailed within the credibility assessment portion of this Report.  See Subpart E, subsection b, supra.

[8]Plaintiff's Brief at page 10.

[9]Plaintiff's Brief at page 4.

12

In January, February, June, and August 2001, x-ray reports show that "[t]he implant appears to be well fixed and the bone well healed. Although there is some comminution and residual deformity" and "some callous formation." (TR 140-43). On March 20, 2003, Dr. Walter noted that the "x-rays do show at least some joint space narrowing," and stated that this was probably "some form of post-traumatic arthritis." (TR 211). On April 12, 2002, Dr. Safley stated that "[x]-rays show internal fixation in place for a presumed tibial plateau fracture [and, further] [h]is x-rays and examination do not show anything that I could suggest surgical treatment for." (TR 216). Lastly, on January 15, 2003, a postoperative x-ray showed that there was "lucency[10] seen secondary to previous hardware from plate and screws most likely transfixing a lateral tibial plateau fracture. No evidence of an acute fracture is seen." (TR 232). However, none of the aforementioned x-ray reports show disabling injury as opined by treating physicians or any other indication that Plaintiff is limited to the extent he alleges. Additionally, as noted above some of the x-ray reports show improvement at times.

Plaintiff also argues that operative reports and Physician's opinions document the severity of the injury.[11] However, Plaintiff only cites to the operative report of January 14, 2003, and to Dr. Walter's statement that the improvement of Plaintiff was "remarkable," following that surgery. (TR 165-66, 182). However, Plaintiff cites to no other medical opinions or evidence that he is disabled. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument

---

[10]"Lucency -- An increase in blackness of an area on the radiograph. . . . Artifacts, changes in position, and soft tissue abnormalities can also cause areas of lucency." See http://www.usfca.edu/fac-staff/ritter/chestx.htm.

[11]Plaintiff's Brief at pages 10-11.

in the most skeletal way, leaving the court to....put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted). Additionally, Plaintiff asserts that he "has a loss of range of motion, crepitation, muscle laxity, and scaring, all of which document the extensive nature of his injuries and the surgery necessary to treatment them."[12] Again, Plaintiff's argument is not supported with any citation to medical treatment records.

Nevertheless, the ALJ discussed the medical evidence regarding Plaintiff's injury. (TR 17-18). He noted that following the initial surgery, Plaintiff used his left leg against his physician's order and bore weight on same. Id. He noted that a consulting doctor found limited range of motion and that he was also unable to assess the Plaintiff's flexion and extension, due to anticipated pain. (TR 18). He also noted that Plaintiff's treating physician took him off work until November 2001, due to the knee injury and that Plaintiff had pain when he was walking, but that this pain "was secondary to weak quadriceps and tight hamstrings, [therefore he] recommended some exercises (Exhibit 3F)." Id.

Further, the ALJ examined the report by Dr. Vanderhorst, (Exhibit 7F), who opined that "the claimant could not stand or walk for any period of time, and sit for 4 hours intermittently." Id. However, the ALJ found that this report was not entitled to deference because the physician indicated that this was the first time he had examined Plaintiff. Id. The ALJ properly considered length of treatment in assessing the medical opinion. 20 C.F.R. § 404.1527(d)(2)(i).

The ALJ also discusses treatment in 2002 for occasional leg pain, but noted that "[a]lthough weight loss and physical therapy/exercise was recommended, there [was] no evidence the claimant complied with either." Id. Additionally, the ALJ stated that due to Plaintiff's left knee pain

---

[12]Plaintiff's Brief at page 11.

14

complaints, "arthroscopic surgery was performed," and although he initially improved following same, he was reporting knee pain about three months later. Id. The ALJ concluded that the combination of impairments, was "severe," but failed to meet a Listing.

The burden remains on Plaintiff at this step of the disability determination. Bowen v. Yuckert, 482 U.S. 137, 146 n5 (1987). The x-ray reports say nothing about the severity of Plaintiff's limitations. As in Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988), the Court stated, "[t]he mere diagnosis of arthritis, of course, says nothing about the severity of the condition. Foster v. Bowen, 853 F.2d 483, 489 (6th Cir.1988) (diagnosable impairment not necessarily disabling)." Likewise, the x-rays here document the injury and ongoing treatment, but without more do not tell the extent of the Plaintiff's alleged restrictions. The ALJ detailed his interpretation of the medical evidence as detailed above. An ALJ is not required to discuss each and every piece of evidence within the record to make a decision based on substantial evidence. Black, 143 F.3d at 386. See also Thacker v. Comm'r of Soc. Sec., 99 Fed.Appx. 661, 665 (6th Cir. 2004) (unpublished).

As it was well stated in Malcolm v. Commr. of Soc. Sec., 2002 WL 1480828, *4-5 (E.D.Mich., 2002), "there was medical evidence on both sides and, having examined it, the undersigned cannot say that the Commissioner's conclusion was not supportable. . . . It is the rare case, the exception, in which every piece of evidence points incontrovertibly towards a decision to deny benefits." Thus, the ALJ made a decision based on substantial evidence.

### ii.    Plaintiff's Testimony

Plaintiff argues that his testimony "that he could not stand, walk, or sit longer than two hours without weakness, pain, and swelling" was consistent with other evidence of record and contrary

to the ALJ's conclusions.[13] (TR 267-68). Specifically, Plaintiff alleges that the testimony regarding the need to elevate his leg is "consistent with the complaints made to Dr. Chamberlain, Dr. Safley and Dr. Walter," as well as reports to his family physician, Dr. Kukler, regarding intermittent swelling of his leg.[14] He fails to cite to same in the record. Although, he did report pain to various physicians, (See e.g., TR 167-76, 199, 211-13, 215-17), he failed to report a need to elevate his leg for extended periods throughout the day to the same physicians. Such an absence of a reported or prescribed need to elevate his leg would be inconsistent with his testimony.

However, the ALJ found that his allegations regarding his need to elevate his leg were "inconsistent with the objective medical evidence, the absence of more aggressive treatment and the claimant's ordinary activities." (TR 19). Therefore, the issue raised here becomes one of credibility.

### b.    Credibility

Plaintiff alleges that the ALJ improperly assessed his credibility.[15] Plaintiff is correct that an ALJ must set forth his or her reasons for determining the credibility of a claimant.[16] Hurst v. Sec'y of Health and Human Servs., 753 F.2d 517, 519 (6th Cir. 1985); Zblewski v. Schwieker, 732 F.2d 75, 78 (7th Cir. 1984).[17] As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

---

[13]Plaintiff's Brief at page 11.

[14]Plaintiff's Brief at page 12.

[15]Plaintiff's Brief at pages 13-15.

[16]Plaintiff's Brief at page 13.

[17]Plaintiff mistakenly cites Zblewski as Sixth Circuit law; however, it is out of the Seventh Circuit.

individual's statements and the reasons for that weight." See also, Murray v. Comm'r of Soc. Sec., 2004 WL 1765530, *4 (E.D. Mich., Aug. 3, 2004) (slip copy).  It is worth noting that in one of the cases relied upon by Plaintiff that the court "emphasize that we do not require a written evaluation of every piece of testimony and evidence submitted.  However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." Zblewski, 732 F.2d at 79.  Further, in Hurst, the Sixth Circuit found that the ALJ had not commented on the disputed evidence at all.  Zblewski, 753 F.2d at 519.

The ALJ in the present case stated that although Plaintiff complained of left knee pain and swelling, as well as pain in his right leg and lower back, these "allegations are inconsistent with the objective medical evidence, the absence of more aggressive treatment and the claimant's ordinary activities."  (TR 19).  Specifically, the ALJ stated that

> [t]he claimant undoubtedly experiences symptoms because of the impairments, but these symptoms have responded to surgery and prescribed medication when taken as instructed, have not been documented by medical findings to be so severe as to produce the symptoms as alleged and do not prevent the claimant from performing an extensive range of daily activities.
> The claimant testified that his surgeries in December, 2002, and July, 2003, relieved his dizziness.  Even if the claimant was not performing regular work activities for his wife's business in March, 2003, Exhibits 10F/6 and 11F/1 indicate that he told Dr. Walten [sic] he was back working as a janitor and on his feet a lot.  Although the claimant testified that this was incorrect, there is little question that his ordinary activities were consistent with the exertional demands of sedentary work.
> The claimant has worked for substantial periods of time as an independent contractor without reporting his self employment earnings (Exhibit 2D and 3E, and the claimant's testimony), a fact that does nothing to enhance his credibility.  Additionally, the claimant stated on January 27, 2003, in Exhibit 10F/16 that he felt better after the knee surgery.  His physician opined at that time that the claimant could probably return to work as a janitor in early March, 2003.
> In light of the aforementioned inconsistencies, and the objective medical evidence of record, the claimant's complaints are not fully credible in accordance with 20 CFR § 404.1529.

(TR 19-20).  Further, the ALJ included a  hypothetical allowed for the need to elevate the left leg

for thirty minutes above waist level during lunch.  (TR 296).  The VE testified that such a limitation

would not change the number of light and sedentary positions testified to the previous hypothetical

to that additional restriction.  Id.  Further, the ALJ gave the option to sit or stand at thirty minute

intervals in the RFC.  (TR 22).  Plaintiff himself testified that he could sit two hours without his leg

elevated, as long as he could move it around.  (TR 269).  Thus, the ALJ's RFC in this regard was

more restrictive than Plaintiff's own allegations.[18]

Plaintiff argues that the ALJ erred in assessing Plaintiff's daily activities.[19]  He argues that

although, the ALJ stated that the daily activities were "extensive," he failed to refer to what evidence

he was specifically referring to.[20]  Nonetheless, Plaintiff concedes that he reported doing dishes,

---

[18]There is an undated and unsigned "statement" from Dr. Walter indicating that Plaintiff
made reports regarding the need to elevate his left leg due to swelling that was submitted to the
Appeals Council.  (TR 244).  However this evidence was not before the ALJ; therefore, it is not
discussed here.  The Sixth Circuit has held that the Court does not have to review new evidence
unless good cause has been shown and the new evidence is material.  Cline v. Comm'r of Social Sec.,
96 F.3d 146, 148 (6th Cir. 1996).  In Cline, it was the claimant's
> primary argument [] that because the Appeals Council considered his new psychiatric
> evidence, the district court was required to do so as well.  He is mistaken.  In Cotton
> v. Sullivan, 2 F.3d 692, 695-96 (6th Cir.1993), this court decided a case very much
> like Cline's, holding that where the Appeals Council considers new evidence but
> declines to review a claimant's application for disability insurance benefits on the
> merits, the district court cannot consider that new evidence in deciding whether to
> uphold, modify, or reverse the ALJ's decision.  The district court can, however,
> remand the case for further administrative proceedings in light of the evidence, if a
> claimant shows that the evidence is new and material, and that there was good cause
> for not presenting it in the prior proceeding.  Id. at 696.

Id.

[19]Plaintiff's Brief at pages 12-13.

[20]Plaintiff's Brief at page 12.

vacuuming, and fixing lunch and dinner in daily activity reports.[21]  He also admits "extensive" activities on May 16, but reports them to be atypical.[22]  Furthermore, Plaintiff admits that he testified "that he occasionally went with his wife to a spa she cleaned, and worked out on the machines while she performed janitorial services."[23]  Therefore, Plaintiff's own assessment of the evidence seems to provide evidence not of error, but that of harmless error.[24]

It is also important to note that Plaintiff argues in his brief that he was simply trying to work out at the gym that his wife cleans, but that he was not working.[25]  He then refers to it as an "unsuccessful attempt," and cites Dr. Walter's notes (TR 211), that "he is back to work.  He is a janitor and he is up on his feet a lot."[26]  Plaintiff explicitly testified that he did not return to work at any time after his injury.  (TR 255-56)  He later explained that he did *try* to return to work with his wife after his injury.  (TR 265).  He explained that he would also work out and swim while he was there, per his doctor's orders.  Id.  He explained that he did "[n]ot [do] very well" when he tried to help her clean there because of his injury.  Id.  Plaintiff's testimony is inconsistent because he stated that he did not go back to work as Dr. Walter noted in March 2003 when questioned by the ALJ, but

---

[21]Plaintiff's Brief at pages 12-13.

[22]Plaintiff's Brief at page 13.

[23]Plaintiff's Brief at page 13, n. 2 (citing (TR 265)).

[24]Plaintiff also asserts that the daily activity reports were the only evidence of daily activities and that there was no testimony regarding same; however, Plaintiff testified that he drives ten to twelve times a week to his children's home or the store and swims in his pool all summer.  (TR 259, 280).  Defendant also notes that in November 2001, Dr. Kovan, a consulting examiner, stated that Plaintiff "is independent with activities of daily living and self-care skills, but avoids heavy household chores."  Defendant's Brief at page 18 (citing (TR 145)).

[25]Plaintiff's Brief at pages 14-15.

[26]Plaintiff's Brief at page 15.

19

then later when questioned by his own attorney regarding the same notes by Dr. Walter, he stated that he did try to do so.  (TR 211, 256, 265).

The ALJ noted the inconsistency with Dr. Walter's notes and Plaintiff's testimony (TR 20), and such inconsistent testimony may be the basis for a credibility determination alone.  See Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 242 (6th Cir. 2002).  In Howard, the Court held that "[b]ecause . . . inconsistent testimony provides a reasonable basis for this credibility determination, the ALJ's characterization of her daily activities and, consequently, any portion of his ultimate conclusion about her ability to perform 'other work' that is dependent upon it is supported by substantial evidence."  Id.

Lastly, Plaintiff argues that his condition has worsened recently, that Supartz injections have failed, and that Dr. Walter noted increased "pain and expressed doubt whether further therapeutic measures would be successful."[27]  (TR 212).  While it is true that Dr. Walter indicated that he was not sure whether the injections would work, he never concluded that they did not work.  (TR 212-13).  In fact, on the next visit, he indicated that "maybe there is something more that could be done if this is not successful."  (TR 213).  His last injection was without complication on May 27, 2003, and he called in for a refill for Vicodin one month later.  Id.  Over four months then passed until the hearing.  (TR 250).  The ALJ acknowledged Plaintiff's receipt of knee injections in his decision.  (TR 18).  Plaintiff made no comment about the injections at the hearing.

In light of the evidence, the Commissioner could reasonably conclude that Plaintiff's complaints were not fully credible.

---

[27]Plaintiff's Brief at page 15.

> The ALJ may have been wrong, but he was not unclear; after listening to what [Plaintiff] said on the witness stand, observing his demeanor, and evaluating that testimony in the light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [Plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment.

Gooch v. Sec'y of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987). The "ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference," and should not be disturbed. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) (citation omitted). The ALJ's decision was based on substantial evidence; thus, this Court cannot challenge that finding. Williamson v. Sec'y of Health and Human Servs., 796 F.2d 146, 150 (6th Cir. 1986) ("The ALJ expressly found Williamson's testimony not worthy of credit, and such credibility determinations ordinarily are given deference by the court.").

## III.   CONCLUSION

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record. Accordingly, I respectfully recommend that the Court **DENY** Plaintiff's Motion for Summary Judgment, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**Dated:**   October 24, 2005

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

## CERTIFICATE OF SERVICE

I hereby certify that on <u>October 24, 2005</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Janet Parker, Assistant United States Attorney, 101 First Street, Suite 200, Bay City, Michigan 48708,</u>

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s):  <u>Brain M. Barkey, G05091 Miller Road, Flint, Michigan 48507</u>.

<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov